Filed 8/9/16  P. v. Fields CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ZELOS FIELDS,<br><br>      Defendant and Appellant. | B255964<br><br>(Los Angeles County<br>Super. Ct. No. BA366220) |

      APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

      Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

      Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Zelos Fields of two counts of first degree murder and two counts of attempted murder, and found true the special allegations that Fields committed the offenses for the benefit of a criminal street gang and he personally and intentionally discharged a firearm that caused great bodily injury or death. The jury also found true the special circumstance that Fields committed multiple murders. The trial court sentenced Fields to two consecutive life terms without the possibility of parole, plus 130 years to life.

Fields challenges his convictions and sentence on three grounds. First, he argues the trial court erred by refusing his request to sever the trials of the two murder counts from each other and from the attempted murder counts, and that this error violated his rights to a fair trial and to due process. Second, Fields argues there was insufficient evidence to support the jury's finding that he personally discharged a firearm in one of the murder charges. Finally, Fields argues there was insufficient evidence to support the jury's finding that he committed each of the offenses for the benefit of a criminal street gang. We conclude that joinder was proper and did not result in a fundamentally unfair trial or otherwise violate Fields's constitutional rights, and that sufficient evidence supported the firearm and gang enhancements. Therefore, we affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

The People alleged that Fields murdered two men, Timothy Ballinger (count 1) and Gouram Wallace, Jr. (count 4), on separate occasions, and attempted to murder two other men, Derrick Boston and Demetrius Thomas (counts 2 and 3), on a third occasion. In connection with each count, the People alleged Fields personally used and discharged

a firearm causing great bodily injury or death (Pen. Code § 12022.53, subds. (b), (c), (d))[1] and that he committed each offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).

      A.     *The Wallace Murder*

At approximately 2:00 a.m. on April 27, 2008, gunshots woke Kenyon Harris in the apartment where he was staying on Figueroa Street. He got up from bed and looked out the back window, but saw nothing. Later that morning, at 6:30 a.m., he discovered Wallace's body on the steps leading to the front door of the building. Wallace had been shot six times.

Police had no suspects in Wallace's death until 11 days later when Ronisha Corbin walked into the 77th Street Community Police Station and told Detective Eric Crosson she had information about a homicide that may have occurred on a porch on Figueroa Street. Corbin told the detective that one or two weeks earlier she was in an apartment where members of the Rollin 60's criminal street gang congregate. She was pretending to be asleep at approximately 10:00 p.m. when several other people in the apartment, including Fields and Jacob Cray (also known as J-Hood), began talking about a murder. Corbin said Fields did most of the talking, and "kept on bringing it up like he was nervous or something." She told Detective Crosson, "[Fields] is like, 'Hey cuz, you know, we just went over there. Um, we chipped, uh, we chipped some nigga.'" Corbin also overheard Fields say, "Me, Scooby, J-Hood, we all was in the car. . . . Like we was just over there and we chipped some nigga on the porch, cuz." Fields explained that they shot Wallace because "he threw up some [gang sign] and it wasn't 60's, so we [unintelligible] like boom, boom, boom, boom, boom and we started off." Detective Crosson asked Corbin, "Who do you think did the shooting? Did they say who actually

---

[1]     Undesignated statutory references are to the Penal Code.

shot?" Corbin said, "[Fields], I know [Fields] did shoot. Um, and I think Jacob shot, too."

Corbin told Detective Crosson that later that night, around midnight or 1:00 a.m., Fields and several others left the apartment to go back to the scene of the shooting. They returned a couple of hours later when Corbin overheard Fields tell Jacob, "Oh yeah, well we pass [by] there and, um, cuz still laid out there on the porch like don't nobody know he dead, like mother fuckers just think he's homeless or like he asleep. He like he just laid out there and nobody did nothing. It's been a few hours. Ain't nobody did shit."

When Detective Crosson asked Corbin if she knew what kind of gun had been used in the shooting, Corbin told him that she had "play[ed]" with the gun's magazine or clip that evening and described the bullets to the detective. She said three or four bullets were missing. She also said officers could likely find the gun in "a dope spot" at the gang hangout or with Fields or another gang member. Detective Crosson later determined that Wallace was the only person who had been killed on Figueroa Street between January 2008 and May 8, 2008, when Corbin gave her statement to police.

At Fields's trial in 2014, the People introduced a recording and transcript of Detective Crosson's interview with Corbin. Corbin also testified in person. On the witness stand she testified she overheard Fields "bragging about what happened" that night, but she could not recall exactly what he had said. "I can say what I said six years ago [to the police] is true. . . . [I]t's not going to change." She said she did recall Fields saying, "'[w]e just chipped a nigga on Fig.'" When asked more details about what she heard, Corbin said she did not remember or could not say because she was "under a lot of stress." When the prosecutor asked, "Are you afraid to come in or is it just nerve-wracking for you," Corbin said, "Both." The People then asked Corbin whether what she had said to the police in 2008 was accurate, and Corbin said it was "very accurate" and truthful.

On cross-examination, counsel for Fields asked Corbin whether she "had information that there were two shooters." Corbin said, "I wouldn't say it was information of two shooters. It's information of all these people being pretty much

4

involved. I wouldn't say – because I didn't know who did the shooting. I just say they all were involved. I couldn't say he did the shooting, I couldn't say either one of them did the shooting." On redirect examination, Corbin again confirmed that what she told the police on May 8, 2008 was true. She also said that at the time she was still hanging out with members of the Rollin 60's gang, but eventually she began to distance herself from them because she was afraid. She said she "can't even go around to see my family no more."

Fields testified in his defense. He said that, although he could not remember what he did on April 27, 2008, he did not shoot Wallace. He also testified that a lot of members of the Rollin 60's gang hung out at the apartment where Corbin claimed she overheard Fields, and that she had a grudge against him because he told others that her "hygiene wasn't up to par" after an intimate encounter with her. After an altercation with Fields, Corbin reportedly told him, "I'm going to fuck you up."


B.      *The Boston and Thomas Attempted Murders*

On the morning of May 1, 2008, four days after the Wallace killing, Derrick Boston and Demetrius Thomas stood on the front porch of Boston's home. A single man approached them wearing a hoodie. As the man drew a gun from his waistband, the hood fell off. The man said, "you all some tramps," using a derogatory term for members of the Eight Tray Gangster criminal street gang, and started shooting at Boston and Thomas from about five feet away. Thomas tried to duck behind a wall but was shot in the back. Boston ran toward the man and tried to grab the gun but was shot in the head. Both Boston and Thomas survived the shooting, but Thomas was paralyzed below his chest.

Police and prosecutors asked Thomas on four separate occasions to identify the shooter. On May 13, 2008 Thomas, while still in the hospital and taking Vicodin and morphine, failed to identify Fields from a photographic lineup. Much later, on December 21, 2009, Thomas identified Fields as the shooter at a live lineup at the 77th Street station. At the preliminary hearing on June 23, 2010, Thomas again identified Fields as the shooter. At trial in January 2014, however, Thomas could not identify Fields.

Thomas said, "He was a lot younger back then.  People change."  When asked if he was sure that the person who shot him was the person he identified at the live lineup and the preliminary hearing, Thomas replied yes.

On cross-examination, Thomas acknowledged he had never seen Fields before the day of the shooting and admitted he only saw him for "about two seconds."  When counsel for Fields attempted to impeach Thomas with testimony from the preliminary hearing in which he said he saw Fields for only one second, Thomas stated, "Man, I seen the man."  Later, Thomas admitted that his memory of the shooter's face was clearer two weeks after the shooting when he was in the hospital than it was over a year later at the live lineup.  He also admitted that at the time of the live lineup he was taking the same amount of painkillers he had taken while in the hospital.

Boston also testified at trial.  He confirmed the general details of the shooting but did not identify Fields, who was in the courtroom, as the shooter.  Boston had identified Fields in a photographic lineup two weeks after the shooting and said the picture of Fields "looks like the guy that shot me."  On cross-examination, however, Boston said a police detective indicated which photo to pick "and I kind of rolled with it."  He explained that the photo he circled looked most like the shooter among the six photographs.  He also said the shooter wore a hoodie that obscured his face, but Boston maintained that he "got a little glimpse."

Boston admitted he had concerns about testifying in court because of "the street code we live by.  You know, you don't tell on nobody."  He said he was afraid of "getting shot again" for testifying against Fields.  The People played a recorded phone message Boston left for the prosecutor two weeks before the trial in which he said, "Everybody is telling me if I testify I'm a dead man.  My mama is scared.  My girl is scared. . . .  Uh, my mama said she doesn't want her house shot up again behind my bullshit. . . .  I'm coming on Friday anyway since I got subpoenaed, but I don't want to do this shit.  I don't want to do it."

In his defense, Fields testified that he could not remember where he was on May 1, 2008. He also stated he had never committed any crimes for the Rollin 60's gang.

### C.     *The Ballinger Murder*

#### 1.     *Testimony of Quincy Leftwich*

Timothy Ballinger was a member of the 74 Hoover gang and went by the moniker "Groove." On February 6, 2009 Ballinger and his female friend Quincy Leftwich were walking Leftwich's daughter to school. On their way back home, a white Camaro approached a stop sign and waited as Ballinger and Leftwich walked toward the car. The driver said to them, "Don't I know you from somewhere?" Ballinger replied, "I don't know. Do I?" While Ballinger talked to the driver, Leftwich walked around the back of the car and noticed two other people in the passenger and back seats. As she walked to the middle of the next block, Leftwich heard gunshots and someone say, "all right, then, Groove." She dropped to the ground and watched as Ballinger ran down the street, chased by the Camaro. The front passenger, a dark-skinned black male in his 20s, held a gun out the passenger window, and Leftwich heard five more gunshots. Leftwich lost sight of Ballinger as he turned a corner, but she heard more gunshots. Several minutes later Leftwich ran in the direction she saw Ballinger and the Camaro turn. Before she could find Ballinger a police officer approached her. Together they discovered Ballinger dead in a residential driveway. Leftwich could not identify the shooter from a photographic or live lineup, but she testified at trial that the person sitting in the front passenger seat of the Camaro had the same skin tone as Fields.

#### 2.     *Testimony of Daniel Harden*

That morning Daniel Harden heard gunshots from inside his home. He ran to his living room window where he saw a black man get out of the passenger side of a white Camaro and fire several more shots over the car, run over to see if the victim was dead, and then get back into the car before it drove away. Later that day two police detectives

interviewed Harden. He told them he "seen a guy just jump out, seen the sparks from his gun, like, [o]h, shit. They is really shooting." The detectives asked, "So he fired two more shots when you're looking?" Harden replied, "Yeah. When I looked he fired two or three more shots again."

Harden told detectives that the shooter was a young, dark-skinned black male, about five feet, seven inches tall, skinny, with short hair, wearing a white, short-sleeved t-shirt and blue jeans. When asked if Harden could identify the shooter if he saw him again, Harden said, "I doubt it because I couldn't see his face that good. I just seen the – when I was looking out the window, I just really seen the back of him." When asked for a description of his face, Harden reiterated that he "really couldn't get the face." Harden said he saw only two people in the car. When detectives asked if he could identify the shooter from a photographic lineup, Harden said he could not. At a live lineup on December 21, 2009, Harden identified Fields as the shooter and the man who got out of the passenger side of the Camaro.

At the preliminary hearing and at trial, Harden said he did not see the face of the person who got into the Camaro. Harden explained that he identified Fields at the live lineup because, among the people in the lineup, Fields's height, weight, body, and head were most consistent with those of the shooter. "He was the closest one," Harden said. Harden also testified that he never saw anyone get out of the Camaro, he never saw anyone from the Camaro fire any gunshots, and he never gave the police a description of the shooter. He later admitted telling the police he saw a five-foot-seven-inch black male get into a Camaro. He also admitted to telling a detective that he was afraid of possible retaliation if he testified against Fields and that there were street gangs in the area where he lived. An officer investigating Ballinger's murder testified that, "when Mr. Harden became aware of the gang allegations, he expressed concern for his safety, he expressed his concern for testifying. He did not want to be in court, he did not want to see the defendant."

8

### 3. *Testimony of Tony Cray*

On December 30, 2009 a police detective interviewed Tony Cray (Cray), the brother of Jacob Cray, and also a member of the Rollin 60's gang. Cray, who was in custody, told the detective that on the morning of the Ballinger murder, Fields and Rollin 60's gang member Mark Thomas picked up Cray in a white Camaro. Thomas drove, Fields sat in the front passenger seat, and Cray sat in back. Cray said, "we were just driving around, man. And I didn't even know he had the gun. And then I just seen the boy and girl crossing the street. And then he called them to the car." Cray said the "boy" told Fields he knew him from somewhere, but the "girl" walked behind the car and kept going. Fields asked the boy, "what do they call you . . . and then he shot." Fields "pulled the trigger, and the dude seen it, like [Fields] fucked up . . . the gun jammed. . . . And then he took off." Cray continued, "[Fields] hopped out, and [Fields] chased him. . . . When we turn the corner, we just see [Fields] chasing that dude. That dude running, like, in backyards or somewhere and [Fields], like, chasing after him. And we heard the shots. And then like that, like bam. And then he came back and got in the car. And I'm like, what the fuck? I'm like, man, drop me off."

At the outset of the interview, Cray said, "But if I tell, if I tell y'all anything and I go to the county, man, you know what's going to happen to me up in there. Y'all don't understand. Y'all just want me to tell you so y'all can have a case and everything." Cray said he would "rather just go out taking the rap than having my own homies kill me in jail." He continued, "fuck it, just book me. Because I'm not going to be no tattletale and then wind up anyway getting dealt with." Eventually Cray told the detective he did not want to go to jail for a murder he did not commit. The detective assured Cray she had turned off the recording devices on the table in the interview room, but a video camera continued recording their conversation. Cray said, "Even though I'm telling the truth, but it's – but still, I'm paranoid, though. . . . And now I've got to worry about this shit when I go to jail." Cray eventually pleaded guilty to attempted murder of Ballinger and testified at trial against Fields.

9

At trial, Cray repudiated virtually everything he said in the 2009 interview. He claimed he was in the Camaro's front passenger seat that morning while another gang member, Anthony Jones, drove the car. Cray said Ballinger and Leftwich approached the car and Ballinger asked for a ride. When Cray refused, Ballinger walked off, and Cray shot him in the back. Cray explained the inconsistencies with his 2009 interview by claiming to have been "under the influence of crystal meth" at the time of the interview. When asked whether he had told the detective, "you think they won't kill me themselves if they find out I'm telling, man?" Cray replied, "I don't recall. I was high. I don't know what you're talking about."

The detective who interviewed Cray testified that Cray did not exhibit any observable signs of being under the influence of methamphetamine. She also said that on the day before Cray testified in court, Cray asked her, "If I took the time for it, don't that mean I did it, if I took the time for it, don't that be what I got to say tomorrow, that I did it and they're going to let him go, right? . . . Because I was going to take the rap for it right now, they going to say I did everything, and they going to let [him] go."

### 4. *Fields's Testimony*

Fields testified that on the morning of February 6, 2009 he was at a friend's house with Jones and Thomas, among others. Fields said he never rode in a white Camaro that morning and was not with Cray after he left their friend's house. He also said he did not shoot Ballinger.

### D. *Ballistics Evidence*

Police recovered three bullet casings from the Wallace murder scene and six from the Boston/Thomas shootings. A police criminalist testified that all of the casings were fired from the same gun.

E.  *The Gang Evidence*

The People presented gang evidence from several witnesses, including Cray, Corbin, Jones, and Fields, and introduced testimony from a gang expert, Officer Gilberto Gaxiola.  Gaxiola testified that the Rollin 60's gang claimed certain territory in south central Los Angeles and in 2008 and 2009 had approximately 1,200 members.  He said the gang's primary activities were robbery, burglary, narcotics sales, vandalism, drive-by shootings, murder, and witness intimidation.  Gaxiola said rivals of the Rollin 60's include the Eight Tray Gangsters, called "tramps" by members of Rollin 60's gang, and the "Hoovers."  Gaxiola said the Eight Tray Gangsters claimed the area in which the Ballinger murder and the Boston/Thomas attempted murders occurred, and the Hoovers claimed the area where Wallace was killed.  He opined that these crimes were committed for the benefit of, or at the direction of, or in association with the Rollin 60's street gang.

The People also introduced prior convictions of two members of the Rollin 60's gang, Antonio King and Albert Hammler.  A jury convicted King on April 30, 2009 for an attempted murder and assault with a firearm that occurred on or about March 19, 2008.  A jury convicted Hammler on November 26, 2008 for an attempted murder and assault with a semiautomatic firearm that occurred on or about September 9, 2006.

F.  *The Verdict and Sentencing*

The jury found Fields guilty on all counts and found true the special allegations that Fields committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members under section 186.22, subdivision (b)(1)(C), and that Fields personally and intentionally discharged a firearm in connection with each offense that caused great bodily injury or death under section 12022.53, subdivision (d).  The jury also found true the special circumstance that Fields committed multiple murders under section 190.2, subdivision (a)(3).

On counts 1 and 4, the murders of Ballinger and Wallace, the trial court sentenced Fields to two consecutive life terms without the possibility of parole plus 25 years to life on each count for the firearm enhancement under section 12022.53, subdivision (d). The court did not impose an additional term for the gang enhancement under section 186.22, subdivision (b)(1)(C). On counts 2 and 3, the attempted murders of Boston and Thomas, the court sentenced Fields to two consecutive terms of 15 years to life, plus an additional 25 years to life on each for the firearm enhancement. Again the court did not impose any additional term for the gang enhancement. The court ordered restitution of $14,042.32, imposed various fines and fees, and credited Fields with 1,589 days. Fields filed a timely notice of appeal.

## DISCUSSION

A. *Joinder Did Not Prejudice Fields or Render the Trial Fundamentally Unfair*

Fields argues that the trial court committed reversible error by denying his motion to sever the trials of the Wallace and Ballinger murders from each other, and the trial on the Boston/Thomas attempted murders from the murder trials. Section 954 permits an accusatory pleading to charge "'two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses'" under separate counts. "The law favors the joinder of counts because such a course of action promotes efficiency." (*People v. Merriman* (2014) 60 Cal.4th 1, 36-37; see *People v. Hartsch* (2010) 49 Cal.4th 472, 493 (*Hartsch*).)

Because the two murder counts and two attempted murder counts are crimes of the same class, all of the crimes in this case come within the provisions of the statute. (See *People v. Jones* (2013) 57 Cal.4th 899, 924 ["murder and attempted murder are of the same class of crimes within the meaning of section 954"]; *People v. Stanley* (2006) 39 Cal.4th 913, 934 ["the charged murder [and] attempted murder . . . were all offenses of the same class and were properly joined under section 954 in the first instance"]; *People*

12

*v. Miller* (1990) 50 Cal.3d 954, 987 ["murder and attempted murder are both assaultive crimes against the person and, as such, are 'offenses of the same class' expressly made joinable by section 954"].)  Thus, section 954 authorizes joinder of the counts against Fields.

Where section 954 authorizes joinder, the trial court still has discretion to order severance "in the interests of justice and for good cause shown."  (§ 954; see *People v. Elliott* (2012) 53 Cal.4th 535, 552 (*Elliott*).)  To establish an abuse of discretion, however, a defendant must make "a clear showing of potential prejudice."  (*People v. Stanley*, *supra*, 39 Cal.4th at p. 934; see *People v. Jones, supra*, 57 Cal.4th at pp. 924-925 ["[t]he statutory requirements for joinder thus being satisfied, defendant '"can predicate error in denying the motion only on a clear showing of potential prejudice"'"].)  "Denial of a motion for severance amounts to a prejudicial abuse of discretion if the trial court's ruling falls outside the bounds of reason."  (*Hartsch*, *supra*, 49 Cal.4th at p. 493; see *People v. Earle* (2009) 172 Cal.App.4th 372, 387.)  "We review a trial court's decision not to sever for abuse of discretion based on the record when the motion is heard."  (*People v. Cook* (2006) 39 Cal.4th 566, 581; *Elliott*, *supra*, at p. 552.)

Finally, even if the trial court did not abuse its discretion in denying severance, we may still reverse if the record shows that joinder resulted in "'"'gross unfairness depriving the defendant of due process of law.'"'"  (*People v. Earle*, *supra*, 172 Cal.App.4th at p. 409; see *People v. Capistrano* (2014) 59 Cal.4th 830, 853 (*Capistrano*); *People v. Soper* (2009) 45 Cal.4th 759, 783 (*Soper*).)  "[T]his rule places a 'high burden' on the appealing defendant."  (*People v. Earle*, *supra*, at p. 409; see *Soper, supra,* at p. 783.)

1.    *The Trial Court Did Not Abuse Its Discretion in Denying the Motion To Sever*

In exercising its discretion in determining whether to sever combined charges, "a trial court should consider (1) whether the evidence relating to the various charges would be cross-admissible in separate trials, (2) whether some of the charges are unusually likely to inflame the jury against the defendant, (3) whether a weak case has been joined

13

with a strong case or with another weak case, and (4) whether one of the charges is a capital offense or the joinder of the charges converts the matter into a capital case." (*Elliott*, *supra*, 53 Cal.4th at p. 551; see *Capistrano*, *supra*, 59 Cal.4th at pp. 848-849; *People v. Cook*, *supra*, 39 Cal.4th at p. 581.) While the last factor was not at issue here,[2] Fields argues that none of the remaining factors supported joinder.

### a. *Cross-admissibility*

The trial court found that there was a "sufficient degree of cross-admissibility of evidence" because the People alleged the same gun was used to shoot Wallace, Boston, and Thomas, and Fields was the gunman in each case. The court also found cross-admissibility on the issue of motive, because all of the crimes resulted from "gang retaliation and/or are just gang related." The court also found there was "some cross-admissibility" with respect to identification. Fields concedes these commonalities but argues at length that they are insufficient to show sufficient cross-admissibility.

"'We frequently have observed that if evidence underlying the offenses in question would be "cross-admissible" in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses.'" (*Hartsch*, *supra*, 49 Cal.4th at p. 493; see *People v. Gonzales* (2011) 52 Cal.4th 254, 282 (*Gonzales*).) Moreover, the absence

---

[2] Although this is not a capital case, Fields argues his sentence of life without the possibility of parole triggers the heightened standard applied in capital cases where joinder gives rise to a special circumstance allegation. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 632 (*McKinnon*).) Such a heightened standard, however, would have little effect in this case because a jury could have found the multiple murder special circumstance true even if Fields had been tried separately for the murders of Wallace and Ballinger. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 575 [joinder had "minimal effect" on the sentence for four murders committed over the course of one year, where "the evidence as to each homicide indicated that defendant intentionally killed with premeditation and deliberation, providing a compelling basis for four convictions of first degree murder and a true finding as to multiple murder even if defendant had been tried separately for each homicide"].)

14

of any cross-admissible evidence "'would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion.'" (*Capistrano*, *supra*, 59 Cal.4th at pp. 849-850; see *People v. O'Malley* (2016) 62 Cal.4th 944, 968 [under section 954.1, "'"'evidence concerning the one offense or offenses *need not* be admissible as to the other offense or offenses"'"' to permit joinder].)

Here, even if the trial court erred in finding there was some cross-admissibility of evidence among the charges against Fields, joinder was proper because none of the other factors shows an abuse of discretion in ordering joinder. (See *McKinnon*, *supra*, 52 Cal.4th at pp. 630-631 ["[w]e need not, and do not, decide th[e] question [of cross-admissibility], however, because . . . defendant fails to establish that, notwithstanding any absence of cross-admissibility, he was unfairly prejudiced by joinder of the two murder cases"].)

### b.  *Likelihood of Inflammatory Evidence*

"To discharge his burden of showing prejudice from the joinder of the charges arising from the two incidents, [a] defendant must show that one of the charged offenses was substantially more inflammatory than the other or was supported by significantly stronger evidence." (*Elliott*, *supra*, 53 Cal.4th at p. 553.)  Where the evidence underlying each of the counts joined in a single trial is similar in nature and equally reprehensible, the likelihood that any particular evidence will "unduly inflam[e]" the jury is remote. (See *McKinnon*, *supra*, 52 Cal.4th at p. 631 [no unduly inflammatory evidence where two killings were each "cruel and brutal and committed for seemingly trivial reasons"]; *People v. Gonzales* (2011) 52 Cal.4th 254, 282 [shooting of an elderly grocer in the course of a robbery and murders of two teenagers in retaliation for a gang murder were both "reprehensible and senseless"]; *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1227 [one offense was not "'unusually likely to inflame' a jury" where evidence underlying all five charges of sexual assault and murder was "'similar in nature and equally gruesome'"].)

15

None of the evidence introduced in connection with the four counts against Fields "was especially likely, or more likely than the other, to inflame the jury's passions." (*McKinnon*, *supra*, at p. 631.)  In each instance of murder and attempted murder, Fields walked or drove up to a targeted individual and shot him in cold blood.  Each of these acts was "reprehensible and senseless"; none of them was "significantly more inflammatory than the other."  (*Gonzales*, *supra*, 52 Cal.4th at p. 282; see *Elliott*, *supra*, 53 Cal.4th at p. 553.)

Fields concedes that each incident involved inflammatory evidence but argues that their cumulative effect was "extremely prejudicial."  Fields cites *Williams v. Superior Court* (1984) 36 Cal.3d 441, in which the Supreme Court observed that evidence of gang membership, where it is the "sole distinctive factor" allegedly common to multiple counts, "might indeed have a very prejudicial, if not inflammatory effect on the jury in a joint trial."  (*Id.* at p. 453.)

The Supreme Court decided *Williams*, however, before the legislature enacted the Street Terrorism Enforcement and Prevention Act, which created sentencing enhancements for gang-related crimes.  (Stats. 1989, ch. 930, § 5.1 (STEP Act).)  The STEP Act made evidence of gang membership admissible especially where, as here, the gang allegations were "inextricably intertwined" with the charged offenses such that the potential for undue prejudice was decreased.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048; see *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1357; *People v. Williams* (2009) 170 Cal.App.4th 587, 609 ["[g]ang evidence . . . is relevant and admissible to prove the elements of the substantive gang crime and gang enhancements"].)  Moreover, since 1984, when the Supreme Court decided *Williams*, the Court has upheld joinder in cases involving gang-related crimes.  (See, e.g., *McKinnon*, *supra*, 52 Cal.4th at pp. 620, 631 [evidence that one murder was "connected to a prior gang-related murder" was not "unduly inflammatory"]; *Gonzales*, *supra*, 52 Cal.4th at p. 282 [evidence that victims "were targeted because they fit the profile of members of a rival gang" was not "particularly inflammatory"]; see also *People v. Burnell* (2005) 132 Cal.App.4th 938, 947

16

[the minimal likelihood of prejudice from gang allegations was outweighed by the benefits of joinder].)

c. *Potential "Spillover" Effect of a Strong Case on a Weak Case*

Fields argues that the evidence relating to the Wallace murder "was particularly weak and, by permitting the joinder of all [four counts], the prosecution was able to significantly bolster the evidence with the spillover effect from the other [three counts]." The individual aspects and evidence supporting one charge, however, frequently will differ from another joined charge. (*Soper*, *supra*, 45 Cal.4th at p. 781.) "A mere imbalance in the evidence . . . will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Ibid*.) Instead, a defendant must show sufficient disparity among joined counts such that "'"'the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges.'"'" (*Capistrano*, *supra*, 59 Cal.4th at p. 848.)

Contrary to Fields's assertion, the evidence supporting his conviction for Wallace's murder was substantial. Corbin, who had known Fields for some time and had at least one intimate encounter with him, testified that she overheard Fields "bragging" about a shooting for which he took responsibility. Among other things, she heard Fields say, "we chipped some nigga on the porch." Corbin also told police that Fields and his companions left the apartment in the middle of the night, and when they returned Fields said the body was still there. Corbin told police she knew Fields shot at the man and believed an accomplice may also have fired shots.

Other evidence corroborated many of the details of the crime related by Corbin. For example, Harris testified that he found Wallace's body on a porch the morning after the shooting. He also testified that he heard gunshots hours before finding Wallace, which corroborated what Corbin overheard Fields say when he returned to the apartment after driving past the scene of the shooting again. Detective Crosson's testimony that Wallace was the only person who had been killed on Figueroa Street between January

17

2008 and May 8, 2008 further confirmed Corbin's testimony that the shooting occurred on Figueroa Street and within the approximate time frame she gave police. Although Corbin equivocated on some aspects of her testimony at trial, she confirmed that what she had told police in 2008 was accurate and explained that she was afraid to testify in court. And ballistics evidence showed that the gun used in the Wallace murder was the same as the gun used in the Boston/Thomas shootings. (See *Gonzales*, *supra*, 52 Cal.4th at p. 282 ["evidence showed that the same gun, and thus inferentially its bearer, was present at both of the murders"].)

Thus, the evidence that Fields killed Wallace was not significantly weaker than the evidence that he killed Ballinger and tried to kill Boston and Thomas. The prosecution's case with respect to each crime was strong but not overwhelming. Although the type and strength of evidence introduced in connection with each count against Fields may have differed, those differences did not cause the evidence in the aggregate to alter the outcome of some or all of the charges. (See *Capistrano*, *supra*, 59 Cal.4th at p. 848.) "'[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.'" (*Soper*, *supra*, 45 Cal.4th at p. 781.)

### 2. *Joinder Was Not Grossly or Fundamentally Unfair*

Fields argues that, even if the trial court did not abuse its discretion in denying his motion for severance, trying the Wallace, Boston/Thomas, and Ballinger counts together "rendered [his] trial fundamentally unfair in violation of his Fifth, Sixth and Fourteenth Amendment rights." In support of his contention that joinder prejudiced him, Fields points to the prosecutor's comment in closing argument, "When you look at everything together, it becomes clear . . . the defendant committed . . . all four of these crimes."

"In resolving a claim that joinder resulted in gross unfairness in violation of a defendant's right to a fair trial and due process, we have observed that a judgment will be reversed on this ground only if it is 'reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.'" (*People v. Merriman*, *supra*, 60 Cal.4th at p. 49; see *People v. Bean* (1988) 46 Cal.3d at 919, 940.) "[W]e look to the evidence actually

18

introduced at trial to determine whether 'a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law.'" (*People v. Bean*, *supra*, at p. 940; accord, *Elliott*, *supra*, 53 Cal.4th at p. 552.) "Appellate courts have found '"no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials."'" (*Soper*, *supra*, 45 Cal.4th at p. 784.)

Here, the evidence underlying all of the crimes was relatively straightforward and distinct, and was "independently ample" to support each of Fields's convictions. (See *Soper*, *supra*, 45 Cal.4th at p. 784.) One or more eyewitnesses identified Fields as the gunman in the Boston/Thomas and Ballinger shootings, and Fields's words, as corroborated by other evidence, supported his conviction for the Wallace murder. Ballistics evidence demonstrated the same gun was used to kill Wallace and to shoot Boston and Thomas, supporting the inference that Fields shot all three men. Although several witnesses at trial retracted or revised portions of their prior statements, the People introduced recordings of their interviews with police that occurred immediately following or shortly after the commission of the crimes, as well as evidence that the witnesses' concerns for their safety may have caused them to alter their testimony in court. The jury could reasonably have decided to, and apparently did, credit the witnesses' earlier statements. Fields's trial was not fundamentally unfair, and joinder of the charges relating to the three shootings did not result in a denial of due process. (See *People v. Elliott*, *supra*, 53 Cal.4th at p. 552 [trial was not "grossly unfair" where the testimony of one or more eyewitnesses identified the defendant as the gunman involved in each incident]; *People v. Cook*, *supra*, 39 Cal.4th at p. 583 [trial was not fundamentally unfair in light of a pretrial statement from a witness who heard the defendant admit responsibility for murder shortly after it occurred, the testimony of eyewitnesses identifying the defendant as the perpetrator, and evidence of the use of the defendant's gun in two of three killings].)

19

B.  *There Was Sufficient Evidence To Support the Jury's Finding That Fields Personally Discharged a Firearm Injuring or Killing Wallace*

In connection with the Wallace murder, the jury found true the allegation that Fields personally and intentionally discharged a firearm causing great bodily injury or death to Wallace within the meaning of section 12022.53, subdivision (d).[3]  Fields contends the evidence is insufficient to support this finding.

The judge instructed the jury with CALJIC No. 17.19.5, in pertinent, part, as follows:

"It is alleged in Counts 1 and 4 that the defendant intentionally and personally discharged a firearm and proximately caused great bodily injury to a person during the commission of those crimes.  If you find the defendant guilty of one or more of the crimes thus charged – we're talking about counts 1 and 4 – you must determine whether the defendant intentionally and personally discharged a firearm and . . . proximately caused great bodily injury or death to a person in the commission of those felonies. . . .  The term 'intentionally and personally discharged a firearm,' as used in this instruction, means that the defendant must have intentionally discharged it. . . .  The proximate cause of great bodily injury or death is an act or omission that sets in motion a chain of events that produces . . . as a direct, natural, and probable consequence of the act or omission the great bodily injury or death and without which the great bodily injury or death would not have occurred."

Fields argues that neither Corbin's testimony nor the ballistics evidence "put the gun in [Fields's] hand on the night of the Wallace homicide or established that [Fields] personally discharged a firearm in the Wallace homicide."  Fields argues that Corbin's testimony established only that Fields "participated in the shooting of Wallace."

---

[3]  Section 12022.53, subdivision (d), provides that a defendant who personally and intentionally discharges a firearm and proximately causes great bodily injury or death in the commission of certain felonies shall be punished by an additional and consecutive term of imprisonment of 25 years to life.

"""We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction."""" (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1472; see *People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1058.) Thus, "'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) Circumstantial evidence may support a true finding on a sentencing enhancement. (See *People v. Law* (2011) 195 Cal.App.4th 976, 983; *People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1436.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility."""" (*People v. Livingston*, *supra*, at p. 1170.)

Substantial circumstantial evidence supports the jury's finding that Fields personally discharged a firearm causing Wallace's death. Corbin overheard Fields "brag" about the crime, consistently using the term "we" to refer to the shooters, thereby implicating himself. Other evidence corroborated many of the details of Wallace's murder, as Fields described them in the Rollin 60's hangout. In addition, ballistics evidence showing that the gunman used the same gun in the Wallace murder as the Boston/Thomas shootings supports the inference that Fields shot Wallace. (See *Gonzales*, *supra*, 52 Cal.4th at p. 282.) The fact that Jacob Cray may also have been a shooter does not negate the evidence that Fields personally and intentionally discharged a firearm. Even if, as Fields suggests, the jury could have reasonably inferred from the evidence that he was merely "involved in the Wallace homicide" and did not actually shoot Wallace, the jury also could have reasonably inferred that Fields did shoot him. Therefore, substantial evidence supported the jury's finding. (See *People v. Albillar* (2010) 51 Cal.4th 47, 60 ["[i]f the circumstances reasonably justify the trier of fact's

21

findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding"]; *People v. Vasquez* (2015) 239 Cal.App.4th 1512, 1517 ["[w]e must accept logical inferences that the jury might have drawn from the evidence although we would have concluded otherwise"].).

C.       *There Was Sufficient Evidence To Support the Jury's Finding on the Gang Enhancement*

The jury found true the allegation that Fields committed each of the crimes for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1)(C).  Fields does not dispute that he was a member of the Rollin 60's gang, nor does he challenge the jury's finding that he acted with the specific intent to promote, further, or assist criminal conduct by gang members. Fields argues that the evidence is insufficient to support the jury's finding because the People failed to show that the Rollin 60's gang engaged in a pattern of criminal gang activity at the time Fields murdered Wallace and Ballinger and attempted to murder Boston and Thomas.

"Section 186.22, subdivision (b)(1), enhances the sentence for 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'"  (*People v. Livingston*, *supra¸* 53 Cal.4th at p. 1170; see *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138 ["[t]he enhancement under section 186.22(b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang"].)  Section 186.22, subdivision (f), defines "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [in section 186.22, subdivision (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

22

Section 186.22, subdivision (e), defines "pattern of criminal gang activity" as "the commission of, attempted commission of, . . . or conviction of two or more of [a list of offenses, which includes attempted murder and assault with a deadly weapon] . . . provided at least one of these offenses occurred after [September 26, 1988] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." The trial court instructed the jury on the definition of "pattern of criminal gang activity" consistent with section 186.22, subdivision (e).

To demonstrate a pattern of criminal activity the People introduced evidence of two prior convictions for attempted murder and assault with a firearm committed by Antonio King and Albert Hammler, both members of the Rollin 60's gang. The dates of conviction in the King and Hammler cases are April 30, 2009 and November 26, 2008, respectively. Fields argues that because, with the exception of the Ballinger murder (which occurred on February 6, 2009), King and Hammler were *convicted after* Fields committed all of the crimes in this case (on April 27, 2008 and May 1, 2008), the People cannot use those convictions as predicate offenses to establish a pattern of criminal activity under section 186.22.

Fields's argument contravenes the plain language of section 186.22, subdivision (e), and Supreme Court authority. Section 186.22, subdivision (e), provides that the prosecution may demonstrate a "pattern of criminal gang activity" by introducing evidence of "the commission of, attempted commission of, . . . or conviction of two or more" enumerated offenses. "The Legislature's use of the disjunctive 'or' in the language just quoted indicates an intent to designate alternative ways of satisfying the statutory requirements." (*People v. Loeun* (1997) 17 Cal.4th 1, 9.) The predicate offenses introduced by the People in this case involved "the commission of" offenses enumerated by the statute that occurred before Fields committed the first of his crimes on April 27, 2008: King committed attempted murder and assault with a firearm on or about March 19, 2008, and Hammler committed attempted murder and assault with a

23

semiautomatic firearm on or about September 9, 2006.  Therefore, King and Hammler's offenses establish a pattern of criminal gang activity under section 186.22.[4]

Moreover, the Supreme Court has held that predicate offenses demonstrating a pattern of criminal activity are not limited to those where the dates of conviction pre-date the date the defendant committed the charged offense.  Indeed, as Fields concedes,  the People could have used the current charged offenses to prove a predicate offense.  (See *People v. Quang Minh Tran* (2011) 51 Cal.4th 1040, 1046 ["a predicate offense may be established by evidence of the charged offense"]; *People v. Loeun*, *supra*, 17 Cal.4th at pp. 10-11 ["the prosecution can establish the requisite 'pattern' exclusively through evidence of crimes committed contemporaneously with the charged incident"]; *People v. Gardeley* (1996) 14 Cal.4th 605, 625 [same].)

The authorities cited by Fields do not support his interpretation of section 186.22, subdivision (e).  As Fields recognizes, *People v. Godinez* (1993) 17 Cal.App.4th 1363 held that crimes "occurring" after the charged offense cannot serve as predicate offenses to prove a pattern of criminal gang activity.  (*Id.* at p. 1369; see *People v. Duran* (2002) 97 Cal.App.4th 1448, 1458 ["[c]rimes occurring after the charged offense cannot serve as predicate offenses to prove a pattern of criminal gang activity"; italics deleted].)  These cases focus on the date that the predicate offense "occurred," or in the language of section 186.22, subdivision (e), the date the offense was "committed," not the date of conviction. (See *People v. Duran*, *supra*, at p. 1458 [because the robbery alleged as a predicate offense occurred on December 3, 1999, two days after the defendant committed the charged offense the prosecution could not use it to prove a gang enhancement].)

---

[4]     Even if, as Fields argues, the prosecution focused on the "convictions" of King and Hammler to demonstrate a pattern of criminal activity, our review of the jury's finding for sufficient evidence is not limited to the words used by the prosecutor. Instead, we review the record in its entirety and in the light most favorable to the judgment to determine whether it contains substantial evidence. (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1170.)  Exhibits 114 and 115, the minute orders in the King and Hammler cases, include the dates on which the two gang members committed the charged offenses.

**DISPOSITION**

The judgment is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.

GARNETT, J.[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.